UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | | |
|---|---|---|---|
| DEMAJIO J. ELLIS, | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | |
| v. | | ) | No. 1:21-cv-02383-JMS-CSW |
| | | ) | |
| JAMIE BAILEY Nurse, et al., | | ) | |
| | | ) | |
| | Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

In this civil rights lawsuit, plaintiff Demajio Ellis has sued over two dozen correctional and medical employees for being deliberately indifferent to his serious medical needs between September 2019 and May 2020 when he was incarcerated at Pendleton Correctional Facility ("Pendleton"). Mr. Ellis alleges that the Defendants denied or delayed his access to medical care when he suffered from shortness of breath, irregular heartbeat, loss of consciousness, and chest pain. He also alleges that one of the Correctional Defendants used excessive force against him while escorting him to the medical unit.

Defendants have moved for summary judgment. Dkts. 152, 161. The undisputed evidence shows that Mr. Ellis did not suffer from a serious medical condition, and—even if he did—the defendants responded reasonably. Nor did Defendant Creel use excessive force when he handcuffed Mr. Ellis. The motions are thus **granted**.

**I.**
**Preliminary Matters**

Mr. Ellis originally brought eight civil lawsuits concerning the same medical complaint. Due to the common questions of law or fact, the Court determined it would save judicial resources by consolidating the actions into one under Federal Rule of Civil Procedure 42(a). Dkt. 15. As a

1

result, this action proceeds against 28 Defendants.

Two Defendants were difficult to serve. Mr. Ellis filed a motion for status update on these Defendants, Nurse Jamie Bailey and Nurse Kristin White, dkt. [184], which is **granted**. Ms. White was served by certified mail in January 2023, and the clerk entered default against her on August 10, 2023. Dkt. 176. Mr. Ellis had through September 8, 2023, to provide evidence of damages against her and failed to do so.

Ms. Bailey was never successfully served, and the U.S. Marshal did not file a report summarizing the efforts to serve her. *See* dkts. 173, 176. While the Court is disappointed that the U.S. Marshal failed to file a report as it was directed to do, in light of the Court's determination that all Defendants are entitled to summary judgment, it will not expend further efforts to serve Ms. Bailey. Rather, the Court will provide Mr. Ellis an opportunity to show cause why summary judgment should not be entered in Ms. Bailey and Ms. White's favor under Federal Rule of Civil Procedure 56(f)(1).

Finally, **the clerk is directed** to update the spelling of the following defendants' names on the docket:

- SERGENT MR. MCKINNEY → Kyle McKinney
- SERGEANT MS. HOWARD → Terra Howard
- STELLMON JENIFFER → Jeniffer Steelmon
- SERGEANT MR. COMMANDER → Christopher Commander
- NURSE MS. SUZAN → Suzanne Deegan
- SERGEANT MR. LOCKE → Joshua Locke
- OFFICER MR. SHEHATA → Ehap Shehata
- SERGEANT MR. GARY → Craig Gary
- NURSE MS. JUEAZ → Leslie Juarez
- NURSE MS. MURPHY → Jodi Murphy
- OFFICER MR. FOSTER → Stephen Foster

- NURSE MR. TONY → Wayne Jones
- LT. MR. MARTZ → Brian Martz
- NURSE MS. LINDA DAVIS CARPER → Linda Carper
- NURSE MS. VIKKI → Victoria VanNess
- OFFICER MR. POOR → John Poor
- OFFICER MR. PAINTER → Shad Painter
- NURSE MS. LOVEALL → Kelly Loveall
- NURSE MS. PRYOR → Kristine Pryor
- DOCTOR MR. KNISER → Martial R. Knieser
- LT. MR. J. JACKSON → Johnathan Jackson
- SERGEANT MS. MASON → Tiffany Mason
- NURSE MS. TIA → Tiea Madden
- OFFICER MR. CREEL → Joshua Creel

The Court now turns to the motions for summary judgment.

## II.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

3

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### III.
### Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Ellis, the non-moving party, and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A.  The Parties

Mr. Ellis is an Indiana Department of Correction ("IDOC") inmate who at all relevant times was housed in a segregated housing unit in Pendleton. Dkt. 154-15 at 5 (13:3−16) (Deposition of Mr. Ellis).[1]

The medical defendants were employed by Wexford of Indiana, LLC ("Wexford"), the company that contracted with IDOC to provide medical care to inmates, and worked at Pendleton.

---

[1] The Court will cite first to the page of the PDF, followed by the page and relevant lines of the deposition.

Dr. Martial Knieser was one of Mr. Ellis' treating physicians. Dkt. 154-2 at ¶¶ 1−2, 5 (Knieser Affidavit). The following Defendants were licensed practical nurses: Amber Plasterer, Jeniffer Steelmon, Jodie Murphy, Kelly Loveall, Linda Carper, Suzanne Deegan, Victoria VanNess. Dkt. 154-3 at ¶¶ 1−2 (Plasterer Affidavit); dkt. 154-4 at ¶¶ 1−2 (Steelmon Affidavit); dkt. 154-5 at ¶¶ 1−2 (Murphy Affidavit); dkt. 154-6 at ¶¶ 1−2 (Loveall Affidavit); dkt. 154-9 at ¶¶ 1−2 (Carper Affidavit); dkt. 154-10 at ¶¶ 1−2 (Deegan Affidavit); dkt. 154-12 at ¶¶ 1−2 (VanNess Affidavit). The following Defendants were registered nurses: Kristine Pryor, Leslie Juarez, Tiea Madden, and Wayne Jones. Dkt. 154-7 at ¶¶ 1−2 (Pryor Affidavit); dkt. 154-8 at ¶¶ 1−2 (Juarez Affidavit); dkt. 154-11 at ¶¶ 1−2 (Madden Affidavit); and dkt. 154-13 at ¶¶ 1−2 (Jones Affidavit).

The following Defendants were correctional officers:[2] Kyle McKinney, Terra Howard, Christopher Commander, Joshua Locke, Ehap Shehata, Craig Gary, Brian Martz, John Poor, Johnathan Jackson, Tiffany Mason, Joshua Creel, Shad Painter, and Stephen Foster. Dkt. 162-1 at ¶ 4 (McKinney Affidavit); dkt. 162-2 at ¶ 4 (Howard Affidavit); dkt. 162-3 at 1 (Commander's Response to Interrogatories); dkt. 162-4 at 1 (Locke's Response to Interrogatories); dkt. 162-5 at 1 (Shehata's Response to Interrogatories); dkt. 162-6 at 1 (Gary's Response to Interrogatories); dkt. 162-8 at ¶ 4 (Martz Affidavit); dkt. 162-9 at ¶ 4 (Poor Affidavit); dkt. 162-11 at ¶ 4 (Jackson Affidavit); dkt. 162-12 at 1 (Mason's Response to Interrogatories); dkt. 162-13 at 1−2 (Creel's Response to Interrogatories); dkt. 21 at 3−4 (Amended Complaint referring to defendants Painter and Foster as "Officer").

### B. Procedure for Assessing Inmates' Medical Concerns

At Pendleton, the standard procedure for a correctional staff member to respond to an inmate's request to be seen by medical staff was to direct the inmate to complete a health care

---

[2] Because their particular rank does not affect the outcome of this action, the Court does not distinguish between whether each Defendant was a lieutenant, sergeant, or officer.

request form and contact the medical department. Dkt. 162-12 at 2; dkt. 162-11 at ¶ 6; dkt. 162-8 at ¶ 5. The medical staff would advise the officer whether the inmate should be escorted to the infirmary for treatment. Dkt. 162-8 at ¶ 6. If medical staff advised that the inmate did not need medical attention for a specific concern, the officer would not escort the inmate to the medical unit. *Id.* at ¶ 9. If there was a medical emergency, correctional staff would escort the inmate to the infirmary. Dkt. 162-12 at 2. Otherwise, medical staff would schedule a time for the inmate to be seen based on the inmate's request on the healthcare request form. *Id.*

### C. Mr. Ellis' Symptoms and Defendants' Responses

Mr. Ellis was diagnosed with asthma in April 2019. Dkt. 154-15 at 7 (24:18−21). Mr. Ellis has also been diagnosed with anxiety, depression, and antisocial personality disorder. *Id.* at 25 (93:7−9); dkt. 154-1 at 6.

Mr. Ellis testified that between September 2019 and May 2020, he experienced about 20 health episodes in which he would have these symptoms: "chest pains, shortness of breath, irregular heartbeats, . . . passing out unconscious, lightheadedness, wheezing, [and] dizziness." Dkt. 154-15 at 7 (21:20−25; 23:1−5). Mr. Ellis would report to the officers or medical professionals that he "was suffering either an asthma attack or a heart attack" based on these symptoms. *Id.* at 7 (22:24−25). Mr. Ellis believed he was having a heart attack because his uncle died from cardiac arrest in November 2019 and his father died from cardiac arrest in January 2020. *Id.* at 21 (80:13−17). Because Mr. Ellis thought these symptoms indicated a medical emergency, he believed that the Correctional Defendants should have immediately pulled him out of his cell or called the medical department. *Id.* at 10 (35:16−23). As for the Medical Defendants, he believes he should have been given nitroglycerine pills each time he reported his chest pain, or that he should have been taken to a hospital for further testing. *Id.* at 22 (81:11−15), 26 (99:16−25). Mr.

6

Ellis was clear throughout his deposition that he was "suing every Defendant for the same reason[,]" that is, their failure to properly respond to his perceived medical emergency based on these set of symptoms. *Id.* at 9 (32:16−17).

The Court summarizes Mr. Ellis' interactions with the Defendants and other medical professionals. Because the constellation of symptoms—shortness of breath, irregular heartbeats, fainting, wheezing, dizziness, and lightheadedness—are the same for each event, the Court will generally just use "symptoms" for purposes of brevity.

      **i.**      **September 2019**

On September 11, Mr. Ellis reported to Officer McKinney that he had passed out, and Officer McKinney said to wait until a nurse came to the unit. Dkt. 21 at 8. Nurse Bailey came by his cell a few hours later, and Mr. Ellis told her he had passed out and that his inhaler was not helping. *Id.* She told him there was nothing she could do because she was in the midst of handing out medication. *Id.*

After Mr. Ellis submitted several healthcare request forms complaining about these symptoms, he was seen by Nurse Pryor on September 13 and on September 18 by Nurse Conway. Dkt. 154-1 at 17−18, 20−22, 79, 95−97. Mr. Ellis' vitals were normal during both encounters, but both nurses referred him to his provider. *Id.*

Dr. Talbot saw Mr. Ellis for these symptoms on September 24. *Id.* at 23−25. Dr. Talbot diagnosed Mr. Ellis with bronchitis and prescribed Mr. Ellis an antibiotic and an albuterol nebulizer for his asthma. *Id.*

      **ii.**     **October 2019**

Mr. Ellis saw Nurse Janet Mitchell after Mr. Ellis reported passing out on October 4. *Id.* at 26. Mr. Ellis expressed his belief that he needed a special diet because his regular diet was harming

his heart and lungs, but, upon examination, his breathing and vitals were found to be normal. *Id.* at 27. Thus, Nurse Mitchell referred Mr. Ellis "to mental health for obsessive thoughts." *Id.* Mr. Ellis was seen by psychologist Geoffrey Buck on October 8, at which visit Dr. Buck determined that Mr. Ellis held "grandiose and delusional beliefs." *Id.* at 91. Dr. Buck referred Mr. Ellis to a psychiatrist for review of his medication. *Id.* at 92.

Mr. Ellis saw registered nurse Elaine Purdue for these symptoms on October 15. *Id.* at 28−31. Mr. Ellis' vitals were normal, and Nurse Purdue reviewed a May 2019 EKG test with him which showed his heart function was normal. *Id.* Mr. Ellis responded, "That machine is old." *Id.* at 28. She ordered another EKG test. *Id.*

On October 29, Mr. Ellis saw Dr. Talbot for a chronic care visit. *Id.* at 32−35. Mr. Ellis denied irregular heartbeats and shortness of breath, and again his vitals were normal, as was his peak oxygen flow. *Id.* Dr. Talbot concluded that Mr. Ellis' asthma was well-controlled but added prednisone to his medical regimen to assist with mild wheezing. *Id.*

Nurse Steelmon saw Mr. Ellis on October 31 for heart and breathing issues, but his vitals were normal. *Id.* at 36−38. Nurse Steelmon referred Mr. Ellis to the provider for his concerns. *Id.*; dkt. 154-4 at ¶ 8.

### iii.    November 2019

Dr. Talbot saw Mr. Ellis on November 5 to discuss his symptoms. Dkt. 154-1 at 39−43. Mr. Ellis reported shortness of breath and chest pain, and requested a more heart healthy diet. *Id.* Dr. Talbot found no medical indication for a diet change, and he determined that the prednisone had helped Mr. Ellis' asthma symptoms. *Id.* Dr. Talbot noted that Mr. Ellis' blood pressure was high, but that was likely due to his prednisone prescription and would need some monitoring. *Id.*

Dr. Talbot ordered a chest x-ray, which was taken on November 12 and revealed no abnormality. *Id.* at 48.

Mr. Ellis attested that he told Nurse Steelmon and Officer Commander that he was suffering from shortness of breath and chest pain on November 10 and that Nurse Steelmon refused to provide him care, but there is no record of this encounter, and Nurse Steelmon has no memory of it. Dkt. 21 at 14; dkt. 154-4 at ¶ 9.

Mr. Ellis was seen the next day by Nurse Heather Davis for these symptoms. Dkt. 154-1 at 44−47. His vital signs were normal, aside from slightly elevated blood pressure. *Id.* His breathing was unlabored, his lungs sounded clear, his pulse and heart sounds were normal, and no signs or symptoms of distress were observed. *Id.* Due to his complaints of chest pain, he was given one nitroglycerin tablet, as was protocol. *Id.* An EKG was performed, which showed normal sinus rhythm. *Id.*

Dr. Talbot saw Mr. Ellis on November 19 to monitor his asthma and nasal polyps. *Id.* at 48−51. Again, his vitals were normal, and Dr. Talbot advised Mr. Ellis that his November 12 chest x-ray was normal. *Id.*

Mr. Ellis saw Nurse Juarez on November 25 for complaints of vomiting, bloody stool, and loss of consciousness. *Id.* at 52−55. Again, his vitals were normal, and his lungs sounded clear. *Id.* Mr. Ellis told Nurse Juarez that he thought his over-the-counter medications were causing these symptoms, and she advised him to discontinue them until he could see his provider. *Id.* That day, Mr. Ellis had another EKG which was normal. *Id.*

### iv.    December 2019

On December 18, Mr. Ellis told Officer Holmes that he passed out and that his inhaler was not helping with his asthma, and Officer Holmes said he would contact medical. Dkt. 21 at 16.

That day, Mr. Ellis reported his symptoms to Nurse VanNess, and claimed she did nothing. Dkt. 154-12 at ¶ 5. There is no documentation of this encounter, and Nurse VanNess did not remember it. *Id.*

> **v.    January 2020**

Mr. Ellis attested that Nurse Juarez and Nurse Loveall refused to see him on January 31, 2020, for his symptoms, but there is no record that these nurses treated him that day, and neither nurse remembers the encounter. Dkts. 154-6 at ¶¶ 5−6; 154-8 at ¶ 5. Mr. Ellis was seen by Nurse White that day at which time he told her that he had passed out in his cell and needed to be moved because of the mold in the cellhouse. Dkt. 154-1 at 56. Nurse White took his vitals, which were normal, and told him that he would need to return to his cell because there was no evidence that his chest pain was a cardiac issue. *Id.* at 56−58.

> **vi.    March 2020**

Mr. Ellis attested that Nurse Deegan refused to see him for his symptoms on March 3. Dkt. 154-10 at ¶ 5. But there is no evidence of this encounter, and Nurse Deegan does not remember it. *Id.* Regardless, Mr. Ellis was seen by Nurse Sheri Wilson that day, and during the visit he told her that he had passed out "15 times since 2013 when he was slammed on his head." Dkt. 154-1 at 64. He denied chest pain or shortness of breath during the appointment, but he demanded a "CT or MRI to make sure there is nothing wrong with his head" and "to see a real doctor." Dkt. 154-1 at 64. Mr. Ellis' vitals were normal, and no signs or symptoms of distress were observed. *Id.* at 64−67.

Mr. Ellis reported shortness of breath to Officer Commander and Nurse Plasterer on March 14. Dkt. 21 at 30−31. His medical records reflect that he told Nurse Plasterer from his cell that he was suffering from back pain, and he requested an x-ray to see why his back was hurting. Dkt. 154-

1 at 14, 16. Nurse Plasterer listened to his lungs and noted some wheezing, so she asked officers to have him sent to the medical department because she was passing out medication. *Id.* at 16; dkt. 154-3 at ¶ 5. Sgt. Commander told Mr. Ellis that they would try to escort him to medical later because they were busy passing out medication. Dkt. 21 at 31.

Mr. Ellis attested that after this encounter with Nurse Amber, he passed out two more times that evening. Dkt. 21 at 31. He told Sgt. Gary, who called medical and informed Nurses Murphy, Juarez, and Steelmon, but they said they had already been notified of his symptoms by the staff on the dayshift. *Id.* at 32. There is no record of this interaction, and none of the nurses remember it. Dkts. 154-4 at ¶ 10; 154-5 at ¶ 5; 154-8 at ¶ 6. He also attested that he told Officer Foster later that night, and when Officer Foster called the medical department they told him not to escort Mr. Ellis for medical treatment. Dkt. 21 at 33.

Mr. Ellis attested that Nurse Plasterer and Nurse Pryor refused to see him for his symptoms on March 27, but they do not remember this encounter. Dkt. 154-3 at ¶ 7; dkt. 154-7 at ¶ 6. Mr. Ellis was seen, however, by Nurse Kathleen Smith that day for these symptoms. Dkt. 154-1 at 68−71. Nurse Smith noted that Mr. Ellis' vitals were within normal limits, his lungs sounded clear, he had no cough on exam, and no signs or symptoms of distress were observed. *Id.* at 70. An EKG was performed on this date which showed mild sinus tachycardia — a faster than normal rhythm. *Id.* at 71; dkt. 154-7 at ¶ 6. But, based on his otherwise normal vital signs and presentation, the slightly faster than normal heart rate was not especially concerning. Dkt. 154-1 at 70 ("EKG done and was normal. . . . Offender released to cellhouse.").

**vii.     April 2020**

Mr. Ellis was seen in his cell on April 9 by Nurse Carper. Dkt. 154-1 at 12−13. During this encounter, despite reporting an irregular heartbeat and shortness of breath, Mr. Ellis' pulse was

slow and even, and his respirations were even and unlabored. *Id.* Nurse Carper spent about 30 minutes with Mr. Ellis during this assessment. Dkt. 154-9 at ¶ 5. During this encounter, Mr. Ellis interrupted her multiple times complaining about his medical treatment at Pendleton and going "into great detail about his lawsuits and all of the care he does not get[.]" Dkt. 154-1 at 12−13. At one point, Mr. Ellis said he was in tears, but Nurse Carper observed that he did not have tears in his eyes but was smiling. *Id.* During the 30-minute assessment, Nurse Carper observed that Mr. Ellis' respirations were normal and there were no other signs of distress. *Id.* at 13. Nurse Carper left the exam frustrated by Mr. Ellis' unwillingness to listen to her counseling. *Id.* ("This Nurse had to walk away after attempting for over an half hour to educate on my findings that Offender could quote about % of people he has seen on tv that die with everything Normal.") (errors in original).

Mr. Ellis attested that Nurse Plasterer refused to see him for his symptoms on April 14, but there is no record of the encounter, and she does not remember it. Dkt. 154-3 at ¶ 8.

Mr. Ellis attested that Nurse Steelmon ignored him the next day, but she does not remember this encounter. Dkt. 154-4 at ¶ 11. Nurse Plasterer, however, saw Mr. Ellis during medication pass and checked his vitals, which were normal. Dkt. 154-3 at ¶ 9. She had him escorted to the medical department, where he was seen by Nurse Moore-Groves. *Id.* Nurse Moore-Groves found his vitals to be normal, too, but she referred him to the provider for further assessment given his complaint that he has been having these "issues for a while and [was] not getting any better[.]" Dkt. 154-1 at 11.

Mr. Ellis attested that Nurses Steelmon, Madden, and Plasterer refused to see him for his symptoms on April 24, but they do not remember this encounter. Dkt. 154-3 at ¶ 10; dkt. 154-4 at ¶ 12; dkt. 154-11 at ¶ 5. Mr. Ellis was seen by psychologist Dr. Michael Gray that day, and during

this encounter the only medical concerns he reported were fears of infection and illness associated with the COVID-19 pandemic. Dkt. 154-1 at 83−84. Dr. Gray discussed anxiety management strategies with Mr. Ellis and noted that Mr. Ellis' way of thinking reflected grandiosity and a "vulnerability to conspiracy theorizing[.]" *Id.* at 83.

Mr. Ellis saw Dr. Knieser during a chronic care visit to monitor his asthma on April 28. Dkt. 154-1 at 6. During this visit, Mr. Ellis' vitals were normal, and he denied awakening with a cough, difficult or labored breathing, or irregular heartbeat. *Id.* at 7; dkt. 154-2 at ¶ 5. Given the one abnormal EKG reading, Dr. Knieser ordered a follow-up EKG despite his overall impression that Mr. Ellis was "doing well." Dkt. 154-1 at 8.

### viii.    May 2020

Mr. Ellis attested that Nurses Juarez, Steelmon, and Plasterer ignored his concerns about his symptoms on May 15, but there is no record of any interaction with them on that date, and none has any memory of it. Dkt. 154-3 at ¶ 11; dkt. 154-4 at ¶ 13; dkt. 154-8 at ¶ 7. Mr. Ellis also stated in a grievance that Officer Locke ignored his request to get medical assistance. Dkt. 21 at 66.

Mr. Ellis was seen by Nurse Steelmon that evening. Dkt. 154-1 at 80−82. Mr. Ellis told Nurse Steelmon that an EKG would not be indicative of his "heart problems" and he demanded that he be sent to a cardiac specialist. *Id.* at 82. He also joked "about having his own personal clinic and nursing staff on his compound when he gets released from prison[.]" *Id.* Mr. Ellis was "joking and laughing" during the exam, and his vitals were normal, his lungs sounded clear, his heartbeat was regular, and no signs or symptoms of distress were noted. *Id.* at 80−82.

Another EKG was performed on Mr. Ellis on May 18 which showed normal sinus rhythm. *Id.* at 98.

Mr. Ellis attested that Nurse Juarez refused to see him on May 19, but she was not working that day. Dkt. 154-8 at ¶ 8; dkt. 154-14 (Timecard). Mr. Ellis attested that he told Officer Gary of his symptoms that day, and when Officer Gary did not help him, he told Sgt.Commander, who notified a nurse of his symptoms. Dkt. 21 at 68, 70.

Mr. Ellis also attested that Nurse Jones ignored his symptoms on May 25 and that Nurse Plasterer ignored his symptoms on May 29, but neither nurse remembers the encounter and there is no record of it. Dkts. 154-13 at ¶ 5; dkt. 154-3 at ¶ 12.

Mr. Ellis filed a few grievances about his perceived lack of treatment for these symptoms in May 2020. Dkt. 21 at 72. Sgt. Commander responded that "Mr. Ellis does this with some frequency, never really having issues when vitals are checked. Medical has this documented and sends him back almost immediately [ ] every time he is sent to the [medical department]." *Id.* The health services administrator also reported that she had "responded to this same complaint numerous times. He keeps sending the same thing on numerous pieces of paper to the point of harassing the medical department. . . . There is no documentation to his passing out." *Id.*

### ix.    Additional Relevant Facts

Mr. Ellis testified that during this period he fainted approximately 20 times. Dkt. 154-15 at 22 (83:1). But every incident occurred in his cell, and no other person—correctional officer, medical staff, or inmate—witnessed him faint. *Id.* at 22 (83:3−11). Mr. Ellis testified that his medical knowledge comes from reading books and case law about cardiac and respiratory issues and watching commercials on television. *Id.* at 18 (67:5−11).

Based on Dr. Knieser's encounters with Mr. Ellis and his review of his medical records, he has found no objective evidence of a cardiac abnormality. Dkt. 154-2 at ¶¶ 7−9. Mr. Ellis had several normal EKGs, several normal chest x-rays, his vitals were consistently within normal

limits, no signs or symptoms of distress were ever observed during his many encounters with medical staff, and his loss of consciousness was never witnessed. *Id.* at ¶ 9. The only evidence of a respiratory abnormality is Mr. Ellis' asthma. *Id.* at ¶ 8.

Several of the correctional defendants attested that they recalled Mr. Ellis' complaints about these symptoms, and that whenever he reported the symptoms they would contact the medical department and follow their recommendation. Dkt. 162-9 at ¶¶ 7−8; dkt. 162-8 at ¶¶ 7−8; dkt. 162-2 at ¶¶ 7−8. Officer Poor attested that on several occasions when he escorted Mr. Ellis to the medical unit, his symptoms would resolve by the time they arrived, and he would begin complaining about a different set of symptoms. Dkt. 162-9 at ¶ 8.

### D.  Handcuff Incident

Inmates housed in a secured housing unit must be restrained with both handcuffs and leg shackles when they leave their cell. Dkt. 162-13 at 7. There is a "double lock" mechanism on the handcuffs that prevents the handcuffs from tightening too much and helps prevent them from breaking. *Id.*

During one of Mr. Ellis' medical episodes, Officer Creel placed handcuffs on Mr. Ellis before escorting him to the medical unit. Dkt. 154-15 at 12 (43:12−13). After the handcuffs were placed on his wrists, Mr. Ellis told Officer Creel that they were too tight, and Officer Creel responded, "Do you want to go to Medical, or do you want the cuffs off?" *Id.* at 12 (41:20−24). Mr. Ellis felt pain in his wrists from the pressure of the handcuffs. *Id.* at 12 (43:22−25−44:1−2). Mr. Ellis believes that Officer Creel intentionally refused to double-lock the handcuffs so that they would feel tight. *Id.* at 12 (44:21−23). He was in the handcuffs for about 40 minutes. *Id.* at 12 (43:16−17). After the incident, Mr. Ellis submitted an emergency healthcare request form in which he stated that the handcuffs caused "blackish redish 'rashes' and scab soars on both of my wrist."

Dkt. 168-1 at 3 (errors in original). A medical staff member responded on the form, "Areas are dry[.] Apply moisturizer per MD." *Id.*

## IV.
### Discussion

Mr. Ellis proceeds on Eighth Amendment deliberate indifference claims against all 28 defendants based on their refusal to provide him immediate access to medical care or constitutionally adequate care, and an excessive force claim against Officer Creel for the handcuff incident.

### A.  Eighth Amendment Medical Claims

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

### i.      Objective Element—Objectively Serious Medical Need

"When assessing an Eighth Amendment claim, [the court looks] for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic pain.'" *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (quoting *Hayes v.*

16

*Snyder*, 546 F.3d 516, 325 (7th Cir. 2008)).  Further, a condition can be considered serious if the failure to treat it "could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (cleaned up).

Defendants argue that Mr. Ellis' reported symptoms do not constitute an objectively serious medical need because no medical provider has been able to verify that Mr. Ellis experienced the symptoms he alleges since his loss of consciousness was never witnessed, and his vitals, diagnostic test results, and general presentation were always normal. Dkt. 153 at 15 (Medical Defendants' Memorandum in Support of Motion for Summary Judgment); dkt. 160 at 2−3 (Correctional Defendants' Motion to Join Medical Defendants' Motion in Part). For the reasons below, the Court agrees.

There is no medical evidence that Mr. Ellis suffers from a heart abnormality. Dkt. 154-1. Dr. Knieser concluded that based on his review of Mr. Ellis' medical records and his personal interactions with him, he does not suffer from a cardiac abnormality. Dkt. 154-2 at ¶¶ 7−9. Mr. Ellis' self-diagnosis of a heart condition is insufficient given the repeated examinations and diagnostic testing conducted by both nurses and doctors that revealed no such condition. *See Jackson v. Anderson*, 770 F. App'x 291, 293 (7th Cir. 2019) (affirming grant of summary judgment because although the plaintiff told nurses that he possibly suffered a broken facial bone, "they were not required to adopt his diagnosis or demands for an x-ray once they ruled out any signs of a broken bone from their own examinations"); *Green v. Senkowski*, 100 F. App'x 45, 47 (2d Cir. 2004) (affirming grant of summary judgment where plaintiff offered nothing more than his own self-diagnosis that was "unsupported by any medical evidence in the record" and his doctor had concluded that his complaints of wrist pain were "the product of a 'psychosomatic delusion'").

It is undisputed that Mr. Ellis has asthma. "[A]sthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks." *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005). Here, the medical records do not reflect that Mr. Ellis was suffering from a severe asthma attack at any time relevant to this action. Dkt. 154-1; *see Williams v. Rodriguez*, 509 F.3d 392, 401−02 (7th Cir. 2007) (noting that whether asthma constitutes a serious medical condition for purposes of a constitutional claim depends on the symptoms that were manifesting at the time the plaintiff interacted with the defendants). Rather, Dr. Talbot found that Mr. Ellis' asthma was well-controlled, and Mr. Ellis was consistently provided treatment for his asthma when the nurses or doctors heard evidence of minor wheezing. *Id.* at 16, 32−35.[3]

Accordingly, the Court concludes that Mr. Ellis did not suffer from a serious medical condition as it relates to the complaints in this action, and all 28 defendants are entitled to summary judgment on Mr. Ellis' Eighth Amendment medical claims.

### ii.      Subjective Element—Deliberate Indifference

In the alternative, even if the Court were to assume that Mr. Ellis' symptoms related to his asthma were sufficient to constitute a serious medical need, there is no evidence from which a reasonable jury could conclude that any defendant acted with deliberate indifference.

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). A defendant must make a decision that represents "such a substantial departure from

---

[3] The Court further observes that Mr. Ellis sued Dr. Talbot for his treatment for his asthma in another lawsuit in this Court. *Ellis v. Talbot*, 2021 WL 4477794, No. 1:19-cv-04570-JPH-DLP (S.D. Ind. Sept. 30, 2021). In that case, Judge Hanlon concluded that Dr. Talbot was not deliberately indifferent to Mr. Ellis' asthma given Dr. Talbot's treatment for Mr. Ellis including medication, diagnostic testing, lifestyle counseling, and referral to a mental health provider for his anxiety. *Id.* at *7.

accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). Further, "an inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotation marks and citations omitted)). The Court must defer to the treatment decisions of medical professionals "unless no minimally competent professional would have so responded under those circumstances." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The Court examines the totality of Mr. Ellis' medical care when evaluating whether the defendants were deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

In this case, Mr. Ellis made frequent complaints about chest pains and breathing issues. Despite the Medical Defendants' awareness that these complaints never revealed a medical emergency, they examined Mr. Ellis and provided appropriate treatment in the form of referrals to the provider, medication for his asthma, and diagnostic testing. Dkt. 154-1. Further, a non-defendant nurse recognized that Mr. Ellis' concerns could be a manifestation of a mental health issue and referred him to a mental health provider. *Id.* at 27. As an inmate, Mr. Ellis has no right to demand specific care such as a referral to a cardiac specialist or specific imaging, and he has presented no admissible evidence that the Medical Defendants' treatment choices were outside the prevailing standards. *Walker*, 940 F.3d at 965. His own opinion that he should have received different or faster care is not enough to show deliberate indifference. *Pyles*, 771 F.3d at 409; *see*

*also White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (non-movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)).

Correctional Defendants are also entitled to summery judgment on the subjective element. Correctional staff may defer to the decisions of medical staff unless they have reason to know that medical staff are failing to adequately treat an inmate. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022). Here, Correctional Defendants followed IDOC protocol by contacting medical staff when Mr. Ellis complained of his symptoms and deferring to their decision as to whether he needed to be escorted to the medical unit immediately or should submit a healthcare request form so that they could schedule an appointment later.

In summary, Mr. Ellis was not suffering from a medical emergency at any time, and there is no evidence from which a reasonable jury could conclude that any Defendant was deliberately indifferent to Mr. Ellis' medical needs. They are entitled to summary judgment on this claim.

**B.  Eighth Amendment Excessive Force Claim**

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). This rule does not bar *de minimis* force unless the force is "of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (per curiam) (cleaned up). Even if the force applied is not *de minimis*, it remains permissible if used "in a good-faith effort to maintain or restore discipline." *McCottrell*, 933 F.3d at 664 (cleaned up). But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good-faith and malicious force, courts consider several factors, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the

> extent of the threat to the safety of staff and inmates, as reasonably perceived
> by the responsible officials on the basis of the facts known to them; and (5) any
> efforts made to temper the severity of a forceful response.

*Id.* at 663; *see also Whitley v. Albers*, 475 U.S. 312, 321 (1986). These factors are sometimes referred to as the "*Whitley* factors." Additionally, to survive summary judgment, a plaintiff must present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

The *Whitley* factors favor Officer Creel. First, the need for the application of handcuffs adhered to IDOC policy that required that inmates in segregated housing units be restrained during escorts. Dkt. 163-7. Thus, although Mr. Ellis perceived Officer Creel's question—"Do you want to go to Medical, or do you want the cuffs off?"—as evidence of malice, it was a rhetorical question to explain that policy to Mr. Ellis. Second, the injury was minor—the only treatment it required was moisturizer. Dkt. 168-1 at 3. Thus, even assuming that Mr. Ellis suffered discomfort from the placement of the handcuffs, there is no evidence from which a jury can infer that Officer Creel acted with malicious intent to inflict pain rather than to escort a handcuffed inmate consistent with IDOC policy. *See Whitley*, 475 U.S. at 319 ("The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."). Accordingly, Officer Creel is entitled to summary judgment.

## V.
## Further Proceedings

All Defendants sought summary judgment except for Nurse Jamie Bailey, who was never served with the complaint, and Nurse Kristin White. The Court concludes that Nurse White and

Nurse Bailey are entitled to summary judgment for the same reasons the other Medical Defendants were entitled to summary judgment.

Federal Rule of Civil Procedure 56(f)(1) provides that the Court may grant summary judgment for a nonmovant so long as it provides the parties notice and a reasonable time to respond. Mr. Ellis has **through March 6, 2024**, to show cause why summary judgment should not be entered in favor of Nurse White and Nurse Bailey.

Additionally, the Court observes that Mr. Ellis has two pending lawsuits in this Court about the same constellation of symptoms. In *Ellis v. Nyiedye, et al.*, 1:22-cv-02481-JRS-TAB, he is suing 13 medical and correctional defendants for their actions when Mr. Ellis was housed at New Castle Correctional Facility. *See* dkt. 15 (Screening Order). In *Ellis v. Samaniego, et al.*, 1:22-cv-02482-JRS-TAB, he is suing 15 correctional and medical defendants for their actions when Mr. Ellis was housed at Correctional Industrial Facility. *See* dkt. 13 (Screening Order). Litigating a case based on a factually frivolous medical condition consumes both the parties' and the court's time. **The clerk is directed** to docket this Order in those cases, 1:22-cv-02481-JRS-TAB and 1:22-cv-02482-JRS-TAB, for the court and defendants' consideration.

## VI.
## Conclusion

The Court concludes that Mr. Ellis' complained-of symptoms of shortness of breath, irregular heartbeats, fainting, wheezing, dizziness, and lightheadedness did not constitute a serious medical need. In the alternative, Defendants provided reasonable medical care for Mr. Ellis' symptoms. Officer Creel is entitled to summary judgment on the excessive force claim. Thus, both

Medical and Correctional Defendants' motions for summary judgment, dkts. [152] and [161] are **granted**.

Mr. Ellis' motion for a status update, dkt. [184], is **granted**. Pursuant to Federal Rule of Civil Procedure 56(f)(1), Mr. Ellis has **through March 6, 2024**, to show cause why summary judgment should not be entered in favor of Nurse White and Nurse Bailey. No partial final judgment shall issue at this time.

The **clerk is directed** to update Defendants' names as provided in Section I of this order, and to docket a copy of this order in *Ellis v. Nyiedye, et al.*, 1:22-cv-02481-JRS-TAB and *Ellis v. Samaniego, et al.*, 1:22-cv-02482-JRS-TAB.

**IT IS SO ORDERED.**

Date: 2/9/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DEMAJIO J. ELLIS
166596
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel